## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CHRIS MERCAVITCH,** | : |
| | : |
| **Plaintiff,** | : |
| **v.** | :   **3:16-CV-32** |
| | :   **(JUDGE MARIANI)** |
| **BOROUGH OF WYOMING, et al.,** | : |
| | : |
| **Defendants.** | : |

### MEMORANDUM OPINION

#### I. INTRODUCTION AND PROCEDURAL HISTORY

In this action, Chris Mercavitch ("Plaintiff"), a police officer for the Borough of

Wyoming, claims that the Borough and Mayor Robert Boyer (collectively "Defendants"),

engaged in a variety of unlawful acts with respect to his employment. Specifically, Plaintiff's

Amended Complaint, (Doc. 12), brings four claims: two First Amendment retaliation claims

brought pursuant to 42 U.S.C. § 1983 alleging that Defendants retaliated against Plaintiff

because he made a report to the Pennsylvania State Police and then filed the present

lawsuit (Counts I & IV), a procedural due process claim brought pursuant to 42 U.S.C. §

1983 alleging that Plaintiff received insufficient notice with respect to a *Loudermill* hearing

(Count II), and a claim that alleges that Defendants violated a variety of state and federal

statutory provisions by failing to properly pay Plaintiff for certain overtime he worked (Count

III). Presently before the Court is Defendants' Motion for Summary Judgment. (Doc. 31).

For the reasons that follow, the Court will grant in part and deny in part Defendants' Motion.

## II. STATEMENT OF UNDISPUTED FACTS

In accordance with Local Rule 56.1, Defendants submitted a Statement of Material Facts in Support of their Motion for Summary Judgment, (Doc. 32), as to which they contend that there is no genuine dispute for trial, and Plaintiff submitted a response, (Doc. 38). Thus, the following facts are undisputed, except as specifically noted:

In the summer of 2015, Plaintiff was working as a Police Captain for the Borough of Wyoming Police Department. (Dep. of Chris Mercavitch, Doc. 33-1 at 14; Doc. 33-2 at 1, 13). At that time, he had been working for the Department for approximately twenty-seven years and was one of three full-time employees along with Commissioner Michael Flanagan and Sargent Michael Fuller.[1] (Dep. of Chris Mercavitch, Doc. 33-1 at 14; Dep. of Michael Fuller, Doc. 37-5 at 65).

Sometime during that summer, Plaintiff received a phone call from Fuller who relayed a story he had been told which indicated that the Borough of Wyoming Manager, Tamra Smith—who was dating Defendant Boyer—lowered a bid on a dump truck that the Borough was selling so that the bidder could obtain the truck for less money. (Doc. 32 at ¶ 14; Doc. 38 at ¶ 14; Dep. of Chris Mercavitch, Doc. 33-1 at 15-16, 25-26). Believing that this constituted a crime, Plaintiff suggested that Fuller should contact Trooper Schutter at the Pennsylvania State Police to report the incident. (Dep. of Chris Mercavitch, Doc. 33-1 at 16). After ending the phone call with Fuller, Plaintiff also contacted Trooper Schutter,

---

[1] In a companion case docketed at 3:15-CV-2197, Fuller also brings two First Amendment retaliation claims against the Borough of Wyoming and Mayor Boyer.

2

summarized what Fuller had told Plaintiff, and advised Schutter that Fuller would be contacting him. (*Id*. at 21; Doc. 32 at ¶ 16; Doc. 38 at ¶ 16).

On December 2, 2015, Plaintiff sustained a work related injury and began receiving benefits under the Heart and Lung Act. (Dep. of Chris Mercavitch, Doc. 33-1 at 12). Two days later, while at home, Commissioner Flanagan hand delivered a letter to Plaintiff notifying him that a *Loudermill* hearing would be conducted to address an allegation "that on November 20, 2015 and potentially several other occasions [Plaintiff] failed to respond to 911 dispatch center calls and complete police reports." (Doc. 33-2 at 1; Dep. of Chris Mercavitch, Doc. 33-1 at 39-40). A hearing was held on December 10, 2015, and Plaintiff, represented by counsel, read a prepared statement summarizing his version of the events that occurred on November 20, 2015. (Doc. 33-2 at 3-8). According to the Borough, Plaintiff failed to respond to a 911 call on November 20, 2015. (*Id*. at 4-5). According to Plaintiff, after the 911 call was dispatched, Commissioner Flanagan told Plaintiff not to respond to the call. (*Id*. at 6-8). After Plaintiff read his statement, the Borough advised Plaintiff of six other dates for which they alleged that Plaintiff failed to properly document calls. (*Id*. at 9). Plaintiff did not respond to those allegations. (*Id*. at 10).

By letter dated January 5, 2016, Plaintiff was advised that upon returning to work, he would be "reassigned to the rank of patrolman" and be given a fifteen day suspension because "[t]he Borough ha[d] reason to believe that [Plaintiff] ha[d] failed to respond to 911

dispatch center calls and failed to complete police reports." (*Id.* at 13). Three days later, Plaintiff initiated the present lawsuit. (Doc. 1).

## III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should

4

be granted, "[t]he court need consider only the cited materials, but it may consider other

materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light

most favorable to the non-moving party, and where the non-moving party's evidence

contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW,*

*Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912,

113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127

S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary

judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts. Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial. The mere existence of some alleged factual dispute between
> the parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no *genuine* issue of
> *material* fact. When opposing parties tell two different stories, one of which is
> blatantly contradicted by the record, so that no reasonable jury could believe
> it, a court should not adopt that version of the facts for purposes of ruling on a
> motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV. ANALYSIS

Defendants have moved for summary judgment on all of Plaintiff's claims. The Court

will address each of Defendants' arguments in turn.

## A. First Amendment Retaliation Claims

Counts I and IV of Plaintiff's Amended Complaint claim that Defendants retaliated against Plaintiff for a report he made to the Pennsylvania State Police and for filing this lawsuit. "To state a First Amendment retaliation claim, a public employee plaintiff must allege that his activity is protected by the First Amendment, and that the protected activity was a substantial factor in the alleged retaliatory action." *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009). "'The first factor is a question of law; the second factor is a question of fact.'" *Id*. (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006)). "If these two elements are satisfied, the burden shifts to the defendants to demonstrate that the same action would occur if the speech had not occurred." *Id*.

"The [Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). If public employees speak in the course of their employment, "the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id*. at 421. However, if an employee speaks as a citizen on a matter of public concern, "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id*. at 418.

6

As such, a Court must apply a three-step analysis in evaluating a public employee's

retaliation claim for engaging in protected activity. *Baldassare v. New Jersey*, 250 F.3d 188,

194 (3d Cir. 2001).[2]

> First, plaintiff must establish the activity in question was protected. For this
> purpose, the speech must involve a matter of public concern. Once this
> threshold is met, plaintiff must demonstrate his interest in the speech
> outweighs the state's countervailing interest as an employer in promoting the
> efficiency of the public services it provides through its employees. These
> determinations are questions of law for the court.

> If these criteria are established, plaintiff must then show the protected activity
> was a substantial or motivating factor in the alleged retaliatory action. Lastly,
> the public employer can rebut the claim by demonstrating it would have
> reached the same decision even in the absence of the protected conduct.

*Id.* at 195 (alterations, internal citations, and quotation marks omitted).

Count I of Plaintiff's Amended Complaint alleges that Defendants retaliated against

Plaintiff for his phone call to Trooper Schutter. Count IV alleges that Defendants also

retaliated against Plaintiff because he filed this lawsuit. Defendants do not contest that the

above acts constitute speech that is protected under the First Amendment. (Doc. 34 at 9).

Instead, Defendants argue that there is no evidence of a causal relationship between

Plaintiff's protected activities and Defendants' alleged retaliatory actions. (*Id.* at 9-12).

"To establish the requisite causal connection a plaintiff usually must prove either (1)

an unusually suggestive temporal proximity between the protected activity and the allegedly

---

[2] The Third Circuit's decision in *Baldassare* preceded the Supreme Court's ruling
in *Garcetti*. However, a review of both decisions demonstrates that the *Baldassare* decision and the
principles upon which it is based are entirely consonant with the Supreme Court's holding and reasoning
in *Garcetti*.

7

retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal

link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). "In the

absence of that proof the plaintiff must show that from the 'evidence gleaned from the

record as a whole' the trier of the fact should infer causation." *Id.* (quoting *Farrell v. Planters

Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). "For example, a plaintiff may establish

the connection by showing that the employer gave inconsistent reasons for terminating the

employee." *Farrell*, 206 F.3d at 281.

Initially, the parties disagree about when Defendant Boyer first learned about

Plaintiff's phone call to Trooper Schutter. Defendant Boyer testified that he first learned of

the phone call when Plaintiff filed the lawsuit on January 8, 2016. (Dep. of Robert Boyer,

Doc. 33-3 at 37-38). Plaintiff, however, argues that Plaintiff's testimony shows that

Defendant Boyer knew of Plaintiff's phone call as early as November 18, 2015. (Doc. 37 at

8). Plaintiff relies on the following testimony he gave:

Q   But my specific question to you is: What was the date that Boyer knew
    you had contacted, let me finish, that you had contacted Schutter?

MS. POLLICK: Asked and answered, objection.

MR. McDONOUGH: That wasn't an answer.

THE WITNESS: November 18th.

BY MR. McDONOUGH:

Q   Okay.

A   Of 2015.

8

Q       So on November 18, 2015 you became aware that Boyer knew that
        you had made a report to the [Pennsylvania State Police]?

A       Indirectly became aware.

Q       How did you become aware?

A       I have an -- I'm a firearms instructor and I have a USB with all my
        firearms manuals and everything on it.

Q       Okay.

A       And on the 18th I was at the Wyoming building, I was looking at
        something with my USB in the computer. I forgot it when I went home.
        The next day when I came back, the USB was gone with all my
        information. But on that USB drive there was a file that had what Fuller
        was telling me because I put in the file bid $1,500 and Fuller, I put the
        names in just so I remembered to tell Schutter in case he asked me.

Q       In case you remember --

A       I did have a -- write something when Fuller told me, but I forgot.

Q       Is that where -- where is that USB drive currently?

A       I don't know. I reported it stolen.

Q       So you haven't seen it since November 18, 2015?

A       Correct.

Q       Help me understand how the -- strike that. Do you know who stole that
        USB drive?

A       No, I do not.

Q       Help me understand how the loss of that USB drive leads you to
        conclude that as of November 18, 2015 Boyer was aware of the fact
        that you were one of the sources of the complaint relating to Tamra
        Smith.

                                      9

A       Because they had just that little brief information on Fuller, how much
        the bid was and just that little bit would put me involved.

Q       But how do you know that Boyer had access or reviewed that USB
        drive?

A       Because after that date, things just got a little more hostile at work.

Q       Have you heard from any third party that Boyer either took or reviewed
        the information on that USB drive?

A       No, sir.

(Dep. of Chris Mercavitch, Doc. 33-1 at 27-29). For his part, Defendant Boyer denies ever

seeing or receiving Plaintiff's USB drive or any information contained on it. (Dep. of Robert

Boyer, Doc. 33-3 at 45-46).

Boyer's testimony meets Defendants' burden on summary judgment to show that

there is no dispute that the first date Boyer knew of Plaintiff's phone call to Trooper Schutter

was on January 8, 2016. The burden therefore shifts to Plaintiff to come forward with

specific facts that contradict Boyer's testimony on the subject and therefore raise a genuine

issue of material fact for trial. See Lujan, 497 U.S. at 888. Plaintiff's citation to his

deposition testimony has failed to meet this burden. Even when viewing the evidence in a

light most favorable to Plaintiff, no reasonable jury could conclude that Defendant Boyer

knew of Plaintiff's phone call with Trooper Schutter on November 18, 2015. Indeed, Plaintiff

specifically states in his testimony that he does not have any information that Defendant

Boyer either took the USB drive or reviewed the information on the USB drive. While

Plaintiff does testify that, after he lost the USB, "things just got a little more hostile at work,"

10

(Dep. of Chris Mercavitch, Doc. 33-1 at 29), this alone is insufficient to show that Defendant Boyer had knowledge of Plaintiff's phone call with the State Police. *See Ambrose v. Twp. of Robinson*, 303 F.3d 488, 494 (3d Cir. 2002) (finding that a close temporal proximity between a protected activity and an adverse employment action cannot "be used to show that an employer was aware of the protected conduct in the first place."). Consequently, the earliest point in time for which there is record support that Defendant Boyer knew about Plaintiff's phone call to Trooper Schutter is January 8, 2016—the day the lawsuit was filed.

Turning to the individual claims, Count I of Plaintiff's Amended Compliant is predicated on the allegation that Defendants retaliated against Plaintiff because of the phone call he made to Trooper Schutter. (Doc. 12 at ¶¶ 11-28). All of the alleged retaliatory conduct that underlies this claim, however, occurred prior to January 8, 2016. (*Id.*). "It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct." *Ambrose*, 303 F.3d at 493. Because no reasonable jury could find that Defendant Boyer knew of Plaintiff's phone call to Trooper Schutter before January 8, 2016, any adverse employment actions taken before that date could not, as a matter of law, be causally connected to Plaintiff's phone call. Therefore, the Court will grant Defendants' Motion as it pertains to Count I of Plaintiff's Amended Complaint.

Count IV of Plaintiff's Amended Complaint alleges that Defendants retaliated against Plaintiff because he filed this lawsuit against them. (Doc. 12 at ¶¶ 57-75). Specifically,

Plaintiff alleges three adverse employment actions occurred after January 8, 2016: (1) there

was a delay in Plaintiff receiving one of his paychecks; (2) the position of evidence

custodian was taken away from him; and (3) Defendants scheduled an independent medical

exam to evaluate his continued eligibility for Heart and Lung benefits. (Doc. 37 at 9).

Defendants argue that Plaintiff cannot establish that retaliation played a substantial role in

any of these actions.[3] (Doc. 34 at 10). The Court will address each employment action in

turn.

First, Plaintiff argues that one of his paychecks was delayed in January of 2016.

Specifically, Plaintiff testified as follows:

> I used to pick my paycheck up and then I asked Flanagan if they would mail it
> to me and then they started mailing it to me. And then the one week I had no
> paycheck come in. And I had people look at the building to see if it was in the
> mailbox and it wasn't there. It wasn't hanging from the front mailbox for the
> borough to mail out. They actually had it in the upstairs office which is -- my
> check has never been and I didn't get it for a few weeks which put a lot of my
> bills behind.

(Dep. of Chris Mercavitch, Doc. 33-1 at 71). Further, Plaintiff testified that this delay

occurred because of his phone call with Trooper Schutter. (Id. at 71-72). Plaintiff's

conclusory and unsupported assertion that the delay was retaliatory, however, is insufficient

to survive summary judgment when the record is otherwise devoid of any indication of

retaliation. According to Plaintiff's own testimony, his paycheck was never unavailable, it

---

[3] Plaintiff argues that Defendants have failed to move for summary judgment with respect to Count
IV because they "never mention[ed] the protected activity of filing Plaintiff's Federal Complaint." (Doc. 37 at
3 n.1). Fairly read, however, Defendants' brief seeks summary judgment on both First Amendment
retaliation claims. (Doc. 34 at 12). The Court will therefore address Defendants' arguments as they pertain
to Count IV.

was simply not mailed to him on one occasion. Given that Plaintiff's own testimony indicates that he could have retrieved his paycheck at any time, his allegation that one check was not mailed to him does not amount to an adverse employment action because it would not be "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)).

Next, Plaintiff argues that the position of evidence custodian was taken away from him on March 25, 2016. (Doc. 37 at 8; Dep. of Chris Mercavitch, Doc. 33-1 at 72). Defendants contend, however, that Commissioner Flanagan requested to take over those duties while Plaintiff was injured and could not perform the job. (Aff. of Flanagan, Doc. 33-5 at 7; Doc. 32 at ¶ 46). This is sufficient to meet Defendants' summary judgment burden. Accordingly, it falls to Plaintiff to point to specific facts that contradict this evidence and therefore raises a genuine issue of material fact for trial. *See Lujan*, 497 U.S. at 888. Plaintiff, however, only argues that the evidence custodian position was taken away from Plaintiff after he filed the lawsuit and is thus suggestive of motive. (Doc. 38 at ¶ 46). Nevertheless, because this change occurred almost two and a half months after the lawsuit was filed, the Court finds that the temporal proximity alone is not unusually suggestive. *See Diede v. City of McKeesport*, 654 F. Supp. 2d 363, 377 (W.D. Pa. 2009) (noting that "temporal proximity should be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence," and finding that a one month time period

between speech and adverse action is not unduly suggestive of retaliatory motive). That is not to say, of course, that a time period of this length could never be suggestive of causation. The Court is simply noting that a two and a half month gap between Plaintiff's protected activity and the adverse employment action, without any other evidence indicating a retaliatory motive or any evidence contradicting Commissioner Flanagan's affidavit, does not provide a basis for a reasonably jury to infer causation.

Finally, Plaintiff argues that Defendants have retaliated against him by scheduling an independent medical exam. (Doc. 37 at 9). According to Plaintiff's testimony, he is receiving 100% of his salary through the Heart and Lung Act and his Workers' Compensation benefits are being paid to the Borough. (Dep. of Chris Mercavitch, Doc. 33-1 at 12). Further, with respect to his Workers' Compensation claim, the Borough scheduled an independent medical exam for September 20, 2016. (*Id.* at 13). In Pennsylvania, an employee on Workers' Compensation may be required by his or her employer to undergo an independent medical examination. *See* 77 P.S. § 651(a) ("At any time after an injury the employe, if so requested by his employer, must submit himself at some reasonable time and place for a physical examination or expert interview by an appropriate health care provider or other expert, who shall be selected and paid for by the employer."). Just because an employer is legally entitled to do something, however, does not mean it cannot be done with an improper retaliatory motive. Here, however, Plaintiff has not produced a shred of

evidence that would indicate that Defendants had a retaliatory motive in requesting Plaintiff to submit to an independent medical examination.

Because no reasonable jury could, on the record before this Court, find that any of the alleged adverse employment actions were done with retaliatory motive, this Court will grant Defendants' Motion for Summary Judgment as it pertains to Count IV.

## B. Due Process Claim

Count II of Plaintiff's Amended Complaint alleges that Defendants violated Plaintiff's Fourteenth Amendment rights by providing him with insufficient notice with respect to his *Loudermill* hearing. (Doc. 12 at ¶¶ 30-40). Defendants maintain that Plaintiff received adequate notice. (Doc. 34 at 12-17). The Fourteenth Amendment provides, in pertinent part, that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV § 1. "The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9, 98 S. Ct. 1554, 56 L.Ed.2d 30 (1978). "At the core of procedural due process jurisprudence is the right to advance notice of significant deprivations of liberty or property and to a meaningful opportunity to be heard." *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998).

"To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed

within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law." *Hill*, 455 F.3d at 233-34 (internal citation and quotation marks omitted). Here, Defendants concede that Plaintiff had a constitutionally protected property interest in his continued employment. (Doc. 34 at 14). Thus, the only question before this Court is whether the procedures Defendants used provided Plaintiff with due process of law.

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985), "the Supreme Court held that a public employee who . . . has a property interest in his or her employment is entitled to a *meaningful* pre-termination hearing." *Fraternal Order of Police, Lodge No. 5 v. Tucker*, 868 F.2d 74, 80 (3d Cir. 1989). "It further held that a *sina qua non* of a meaningful hearing is a sufficient explanation of the employer's evidence to permit a meaningful response." *Id.* "[T]he constitutional requirement of a meaningful opportunity to respond before a temporary deprivation may take effect entails, at a minimum, the right to be informed not only of the nature of the charges but also of the substance of the relevant supporting evidence." *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 264-65, 107 S. Ct. 1740, 95 L. Ed. 2d 239 (1987). "Lack of advance notice, however, does not constitute a *per se* violation of due process." *Gniotek v. City of Phila.*, 808 F.2d 241, 244 (3d Cir. 1986).

Here, the notification Plaintiff received regarding his *Loudermill* hearing stated that "[t]he Borough has reason to believe that on November 20, 2015 and potentially several

16

other occasions [Plaintiff] failed to respond to 911 dispatch center calls and complete police reports." (Doc. 33-2 at 1). At the *Loudermill* hearing, Plaintiff, after reading his prepared statement, was informed of several dates in which Defendants believed he failed to properly document calls. (*Id.* at 9). Finally, almost a month after the hearing, Plaintiff received a letter informing him that he would be "reassigned to the rank of patrolman" and be given a fifteen day suspension because "[t]he Borough ha[d] reason to believe that [Plaintiff] ha[d] failed to respond to 911 dispatch center calls and failed to complete police reports." (*Id.* at 13).

Here, even assuming that the notice of the charges was adequate, the record is devoid of any indication that Defendants provided Plaintiff with the "substance of the relevant supporting evidence." *Brock*, 481 U.S. at 264-65. Indeed, both the prehearing notification and the *Loudermill* hearing itself only provided Plaintiff with information about what Defendants believed Plaintiff did or did not do, but did not explain the basis for Defendants' belief. For example, Defendants possessed security camera footage showing who entered and exited the police department on November 20, 2015. (Dep. of Robert Boyer, Doc. 33-3 at 81). Plaintiff, however, received no notice of this evidence. As a result, Plaintiff, even if he was given a chance to tell his side of the story, was afforded no opportunity to rebut the evidence against him and, as a result, was not given "a *meaningful* pre-termination hearing." *See Fraternal Order of Police*, 868 F.2d at 80.

Accordingly, the Court will deny Defendants' Motion for Summary Judgment as it pertains to Count II of Plaintiff's Amended Complaint.

### C. Overtime Claim

Count III of Plaintiff's Amended Complaint alleges that Plaintiff was not properly paid for certain overtime he worked between 2009 thru 2014 in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 *et seq.*, and the Pennsylvania Minimum Wage Act, 43 P.S. § 333.101 *et seq.* (Doc. 12 at ¶¶ 42-55). "The FLSA is . . . fully applicable to municipalities and thus is available to redress the claims of law enforcement personnel." *McGrath v. City of Phila.*, 864 F. Supp. 466, 473 (E.D. Pa. 1994). "Under the FLSA, employers are generally required to pay employees at overtime rates for work in excess of forty hours per workweek." *Rosano v. Twp. of Teaneck*, 754 F.3d 177, 185 (3d Cir. 2014). "An employee's right to receive overtime compensation after working forty hours in a workweek is an important right, and, indeed, is one which a labor union cannot agree to waive on behalf of its members." *McGrath,* 864 F. Supp. at 473-74.

Defendants do not ask this Court to rule on whether the FLSA applies or whether it was violated in this case. Instead, Defendants argue that, pursuant to a "Memorandum of Understanding" between the Borough of Wyoming and the Fraternal Order of Police, Wyoming Valley Lodge # 36, Plaintiff agreed to withdraw his grievance with respect to his

overtime claim, and therefore Plaintiff is foreclosed from pursuing his claim here. (Doc. 34 at 17-21).

In *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 745, 101 S. Ct. 1437, 67 L. Ed. 2d 641 (1981), the Supreme Court held that an adverse arbitration decision does not bar an employee from brining a subsequent claim under the FLSA. "While courts should defer to an arbitral decision where the employee's claim is based on rights arising out of the collective-bargaining agreement, different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers." *Id.* at 737. The Supreme Court reached the same conclusion in *McDonald v. City of West Branch*, 466 U.S. 284, 104 S. Ct. 1799, 80 L. Ed. 2d 302 (1984), in the context of Section 1983.

Then, in *Bolden v. Southeastern Pennsylvania Transportation Authority*, 953 F.2d 807, 825-26 (3d Cir. 1991), an en banc panel of the Third Circuit addressed what effect a prior grievance settlement agreement entered into by a union on behalf of an employee would have on the employee's subsequent Section 1983 claim. The court held that

[i]nsofar as the doctrines of res judicata and collateral estoppel are concerned, the present case differs from *McDonald* in only one particular: in *McDonald* there was a prior arbitration decision whereas here there was a prior grievance settlement that Bolden did not personally endorse. For present purposes, however, we see no basis for regarding this distinction as dispositive. Accordingly, we hold that the grievance settlement in this case did not have a res judicata or collateral estoppel effect with respect to Bolden's Section 1983 claim.

19

*Id.* at 826. The court then concluded that, although Bolden's claim was not barred by the doctrines of res judicata or collateral estoppel, Bolden was nevertheless "bound by the terms of the settlement," which in turn barred his claim. *Id.* at 828-29.

Thus, although the settlement agreement is not given a preclusive effect under *Barrentine* and *Bolden*, this Court must still analyze whether the terms of the agreement render summary judgment appropriate. "A settlement agreement is a contract and is interpreted according to local law." *Wilcher v. City of Wilmington*, 139 F.3d 366, 372 (3d Cir. 1998). "Where a settlement agreement contains all of the requisites for a valid contract, a court must enforce the terms of the agreement." *Mastroni-Mucker v. Allstate Ins. Co.*, 976 A.2d 510, 518 (Pa. Super. Ct. 2009). To ascertain the meaning of a settlement agreement, courts in Pennsylvania apply the familiar rules of contract interpretation. *Thompson v. T.J. Whipple Const. Co.*, 985 A.2d 221, 224 (Pa. Super. Ct. 2009).

"When interpreting a contract, a court must determine the intent of the parties and effect must be given to all provisions in the contract." *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993). "It is firmly settled that the intent of the parties to a written contract is contained in the writing itself." *Id.* "While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact." *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004). "To be 'unambiguous,' a contract clause must be reasonably capable of only one construction." *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997). However, "[a] contract is ambiguous if it is

20

reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986). "If left undefined, the words of a contract are to be given their ordinary meaning." *Kripp*, 849 A.2d at 1163.

The Memorandum of Understanding that Defendants contend blocks Plaintiff's claim was executed in 2014 and purports to resolve several then-pending disputes between the Borough of Wyoming and Plaintiff. (Doc. 33-2 at 14). As relevant here, the agreement states as follows: "the parties agree [sic] resolve the dispute as follows: . . . Mercavitch shall withdraw his grievance seeking payment of accumulated compensatory time." (*Id.*). Contrary to Defendants' arguments, however, this language is insufficient to support a grant of judgment in Defendants' favor at this stage. Simply put, while Plaintiff—through his union representative—appears to have agreed to withdraw his grievance concerning his compensatory time, the Memorandum does not explicitly address Plaintiff's FLSA rights. Thus, although Defendants are free to argue the agreement's meaning at trial, the question of whether the parties intended for the Memorandum to affect Plaintiff's statutory rights is far from clear, and, consequently, renders summary judgment on this claim inappropriate.

Accordingly, this Court will deny Defendants' Motion for Summary Judgment as it pertains to Count III of Plaintiff's Amended Complaint.

## V. CONCLUSION

For the reasons outlined above, this Court will grant in part and deny in part

Defendants' Motion for Summary Judgment.  A separate Order follows.

Robert D. Mariani
United States District Judge